IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 24-cv-3190-WJM-MDB
*Consolidated with Civil Action No. 24-cv-3193-WJM-MDB*

ADRIANA VANCE,
BARRETT HUDSON,
TANYA BEAL,
JULIA RUMP,
JOHN ARCEDIANO,
JANCARLOS DEL VALLE,
ASHTIN GAMBLIN
JERECHO LOVEALL,
ANTHONY MALBURG,
CHARLENE SLAUGH,
JAMES SLAUGH,
BRIANNA WASHINGTON

    Plaintiffs,

v.

EL PASO COUNTY OF COMMISSIONERS,
BILL ELDER,
G.L.G., INC.,
CLUB Q, LLC,
3430 N. ACADEMY, LLC,
MATTHEW HAYNES,
KENNETH ROMINES,
NICHOLAS GRZECKA

    Defendants.

## ORDER GRANTING GOVERNMENT DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants Board of County Commissioners of El Paso County, Colorado ("BoCC") and former El Paso County Sheriff Bill Elder's (collectively, "Government Defendants") motion to dismiss ("Motion") (ECF Nos. 32, 57) certain

claims asserted by Plaintiffs James Slaugh, Brianna Winningham, Adriana Vance, Tanya Beal, Julia Rump, John Arcediano, Jancarlos Del Valle, Ashtin Gamblin, Jerecho Loveall, Anthony Malburg, and Charlene Slaugh's ("Plaintiffs") in their Second Amended Complaint ("SAC") (ECF No. 29).  The Motion is fully briefed.  (ECF Nos. 75, 83.)

For the following reasons, the Motion is granted.

## I.      BACKGROUND[1]

On November 19, 2022, Anderson Aldrich committed a horrific mass shooting at Club Q, an LGBTQ+ nightclub in Colorado Springs, Colorado, killing five people and injuring at least 25 others.  (ECF No. 29 at 14.)  For these acts, Aldrich was sentenced to five consecutive life sentences in state court, and 55 concurrent life sentences to run consecutive to 190 years' imprisonment in federal court.  (*Id.* at 17.)

Plaintiffs' claims against Government Defendants are based on what happened in the years leading up to the mass shooting.  In April 2019, Colorado's General Assembly passed the Colorado Violence Prevention Act, §§ 13-14.5-101 to -116, C.R.S. (2025), also known as Colorado's "Red Flag Law."  (*Id.* at 60–70.)  The Colorado Court of Appeals has summarized that Law as follows:

> This statutory scheme concerns persons, called 'respondents,' who 'pose[] a significant risk of causing personal injury to self or others by having in the respondent's custody or control a firearm or by purchasing, possessing, or receiving a firearm.'  § 13-14.5-104(3)(a), C.R.S. 2023.  When it follows the procedures set out in the red flag law, such as holding an evidentiary hearing, as described in section 13-14.5-105, C.R.S. 2023, a court has the authority to issue an 'extreme risk protection order' requiring the

---

[1] The following factual summary is drawn from the Plaintiffs' Second Amended Complaint ("SAC") (ECF No. 29), except if noted otherwise.  The Court assumes the allegations in the SAC to be true for the purposes of deciding the Motion.  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

2

> respondent to 'surrender all firearms,' § 13-14.5-108(1)(a), C.R.S. 2023.

*People v. Holmes*, 2024 WL 3873422, at *1 (Colo. App. Aug. 8, 2024); *see also Sgaggio v. Polis*, 2023 WL 4364158, at *1 (D. Colo. July 6, 2023) ("Section 13-14.5-103 authorizes the temporary removal of firearms from a person who a judge determines, based on sworn testimony after a hearing, poses significant risk of injury to self or others in the near future.").

An extreme risk protection order ("ERPO") "may be requested by the [respondent's] family or household member, a community member, law enforcement officer or agency, licensed medical or mental health care provider, licensed educator, or district attorney." *Sgaggio*, 2023 WL 4364158, at *1 (citing §§ 13-14.5-103(1)(a–b)). The Red Flag Law "identifies two kinds of extreme risk protection orders." *Holmes*, 2024 WL 3873422, at *1. "One kind lasts for 'a period of three hundred sixty-four days.'" *Id.* (quoting § 13-14.5-105(2)).

> The other kind is a temporary order that is issued 'without notice to the respondent.' § 13-14.5-103(1)(a), C.R.S. 2023. Whenever a temporary order is issued, the court must follow it up with an evidentiary hearing within fourteen days with notice to the respondent. § 13-14.5-103(5)(a). At the evidentiary hearing, the court will decide whether it will extend the temporary order into a three-hundred-sixty-four-day order. *Id.* The temporary order expires on the day of the evidentiary hearing. § 13-14.5-103(5)(b).

*Id.*

In March 2019, before the Red Flag Law had passed, the BoCC announced Resolution No. 19-76 ("Resolution"), which sharply criticized the pending Law; described itself as a "Second Amendment Preservation Resolution"; "pledge[d] not to appropriate funds, resources, employees, or agencies to initiate unconstitutional

3

seizures in unincorporated El Paso County"; and committed to "collaborate with the Sheriff to refuse to initiate unconstitutional actions against citizens." (ECF No. 29-3 at 4.)

In 2020, after the Red Flag Law went into effect, Elder issued the "El Paso County Sheriff's Office Red Flag Statement" ("Statement"), which instructed that "members of the El Paso County Sheriff's Office" will "establish operational plans to safely serve" ERPOs as required by state courts, but it advised that no officer would petition for such an order "unless exigent circumstances exist, and probable cause can be established pursuant to 16-3-301 C.R.S that a crime is being or has been committed." (ECF No. 29-4 at 2.) According to the SAC, "[b]y the time of the Club Q shooting in November 2022, the El Paso County Sherrif's Office had not filed a single ERPO petition under the Red Flag Law, consistent with the policies of both the Sheriff's Office and the Board of County Commissioners established three years earlier." (ECF No. 29 ¶ 96.)

These formal policy pronouncements not to utilize the Red Flag Law extended to Aldrich as well, despite Government Defendants allegedly knowing that they[2] were "dangerous and intended to perpetrate a mass shooting." (*Id.* ¶ 97.) In June 2021, Aldrich's grandmother "called 9-1-1 and reported that her grandson was 'making a bomb in the basement' of their home." (*Id.* ¶ 98.) She reported that Aldrich "told her they planned to be 'the next mass killer' and had been stockpiling ammunition, firearms, and bullet-proof body armor." (*Id.*) After Aldrich's grandparents told Aldrich of their intention to move to Florida, Aldrich aimed a firearm at them and said: "You guys die

---

[2] Aldrich uses they/them pronouns. (ECF No. 29 at 14 n.1.)

4

today, and I'm taking you with me.  I'm loaded and ready.  You're not calling anyone."
(*Id.* ¶ 101.)  Based on these events and others, Aldrich was charged in state court with first degree felony kidnapping and felony menacing, among other crimes.  (*Id.* ¶ 108.)  Ultimately, however, the state court dismissed the charges in July 2022 because the prosecution "fail[ed] to prosecute" after Aldrich's grandparents moved to Florida.  (*Id.* ¶¶ 118, 120.)

In August 2022, the state court "sealed the case records" over no objection from the "district attorney."  (*Id.* ¶ 121.)  That same month, "[l]aw enforcement officials" denied Aldrich's request to return their "seized firearms."  (*Id.* ¶ 122.)  "By August 2022, [Aldrich] could legally possess or obtain firearms without restriction.  Thus, in the months before the Club Q massacre, [Aldrich] accumulated firearms and ammunition to carry out their plan."  (*Id.* ¶ 123.)

In November 2024, Plaintiffs sued Government Defendants, alleging substantive due process violations of their rights to life, liberty, and personal security under the state-created danger doctrine.  (ECF No. 1 at 46–56.)  In March 2025, Government Defendants moved to dismiss the state-created danger claims.  (ECF No. 57.)

## II.   LEGAL STANDARD

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (citation omitted).  "To survive a motion to dismiss," the complaint need not contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

5

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement."  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

### III.   ANALYSIS

Government Defendants contend that the SAC "fails to plausibly allege a state-created danger claim."  (ECF No. 57 at 8.)  Perceiving no allegations establishing "affirmative conduct" by Government Defendants, the Court agrees that dismissal is required here.

It is well-settled that "[a] state actor generally may not be held liable under the Fourteenth Amendment for harm a private individual intentionally or recklessly inflicts upon a victim."  *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018) (citing *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1989)).  "The explanation is simple: Where private violence is responsible for the harm, the state actor has not deprived the victim of any constitutional right; rather the private individual has deprived the victim of life, liberty, or property."  *Matthews*, 889 F.3d at 1143; *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) ("*DeShaney* holds that the state has no affirmative obligation under the Due Process Clause to protect the interests of life, liberty, and property of its citizens against invasion by private actors.") (internal quotation marks omitted).

The Tenth Circuit recognizes two exceptions to this general rule: "Where a

private party inflicts harm upon a victim, a state actor incurs an antecedent constitutional duty to protect the victim if the complainant demonstrates either (1) the existence of a special custodial relationship between the State and victim, or (2) the state actor intentionally or recklessly created the danger that precipitated the deprivation." *Matthews*, 889 F.3d at 1143 (citing *Schwartz v. Booker*, 702 F.3d 573, 579–80 (10th Cir. 2012)).  The state can also be liable under the danger-creation exception if it "increases a plaintiff's vulnerability to danger from private violence." *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (citation omitted).  "Although the Supreme Court has not yet confirmed that a danger-creation exception exists under *DeShaney*, its statements in *DeShaney* "ha[ve] led every Circuit Court of Appeals . . . to recognize an exception to *DeShaney* for 'state-created dangers.'" *Id.*

Plaintiffs rely only[3] on the state-created danger exception to *DeShaney's* general rule, so the Court focuses its analysis accordingly.  *Id.*  "There are two preconditions to asserting a state-created danger claim: (1) the state actor must make an affirmative act and (2) the injury must result from private violence." *Villanueva v. El Paso County*, 463 F.Supp.3d 1202, 1210 (D. Colo. 2020) (citing *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013)).  If the plaintiff clears both these hurdles, they must then satisfy a six-part test:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and

---

[3] Plaintiffs make passing reference to Government Defendants having "exercised custodial control" over Aldrich after he was arrested in June 2021, but the Court does not understand Plaintiffs to allege a special custodial relationship—*i.e.*, to invoke the first exception to *Deshaney's* general rule—by this reference.  (ECF No. 75 at 11.)

7

>proximate harm; (4) the risk was obvious or known; (5)
>defendants acted recklessly in conscious disregard of that
>risk; and (6) such conduct, when viewed in total, is
>conscience shocking.

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) (citation omitted). The Tenth Circuit has made clear that the state-created danger doctrine is a "narrow" exception to *DeShaney's* general rule insulating the state from liability where a private party causes injury. *Matthews*, 889 F.3d at 1150.

Applying these principles, the Court concludes that Plaintiffs' danger-creation claims falter because they are not based on affirmative state conduct. "Affirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). Such conduct "should be directed at a discrete plaintiff rather than at the public at large." *Id.*

Plaintiffs attempt to satisfy this initial precondition by pointing to (1) the Resolution and the Statement, whereby Government Defendants formally announced policies "rejecting red-flag enforcement"; (2) Government Defendants' alleged "minimal investigation" efforts; and (3) Government Defendants' "actively enabling the shooter to reacquire weapons in the months leading up to the tragedy." (ECF No. 75 at 7.) But none of these allegations constitute affirmative conduct under *DeShaney* and its progeny.[4]

---

[4] Plaintiffs also suggest that Government Defendants violated state law, and thus acted affirmatively, by enacting formal policies not to enforce the Red Flag Law. But this argument does not make sense. The Red Flag Law is permissive: It provides that an ERPO "*may* be requested by," among other petitioners, a "law enforcement officer or agency." §§ 13-14.5-103(1)(a–b) (emphasis added). Government Defendants cannot violate a state law by failing to enforce a law it was never required to enforce in the first place.

Starting with the Resolution and the Statement, Plaintiffs argue that these formal policy pronouncements that Government Defendants would not enforce the Red Flag Law "placed the victims at Club Q at an obvious and proximate risk of serious harm," thus constituting affirmative conduct. (ECF No. 75 at 9.)  Plaintiffs are mistaken, however, because the Resolution and the Statement were commitments *to do nothing*, even assuming the Red Flag Law applied to a given respondent.  That is, the Resolution and the Statement were not affirmative acts that created or enhanced a risk of private harm—*i.e.*, that Plaintiffs would be killed by a mass shooter—that did not otherwise exist.  Regrettably, that risk of harm existed all along.  Government Defendants instead declared they would not try to prevent that risk from becoming a reality via the Red Flag Law.  In effect, then, Government Defendants simply maintained the status quo.[5]  *See Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, 1263 (10th Cir. 1998) (allowing liability only if state actors "have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur"); *see also Scott v. Mid-Del Schools Board of Education*, 724 Fed. Appx. 650, 655 (10th Cir. 2018) ("Even if [the state employees] were aware of the danger Mr. McGuire presented, the complaint does not allege that they took any action that made B.P. more vulnerable to the alleged danger.").

The SAC confirms the passive nature of Government Defendants' alleged conduct.  It alleges, for example, that Government Defendants "created or increased the danger to Plaintiffs by"

---

[5] Although the Court does not separately analyze the six elements listed above, this conclusion demonstrates that Plaintiffs have not satisfied the first element regarding creating or enhancing a danger.

- "[r]efusing to enforce Colorado's Red Flag Law";

- [f]ailing to take reasonable steps to prevent the shooter's access to firearms";

- "[m]aintaining a policy of non-enforcement of ERPOs";

- "refusing to allocate resources to enforce the law";

- "[a]llowing the shooter to retain or regain access to firearms, ammunition, bomb-making materials, despite the existence of statutory mechanisms to disarm individuals posing a significant threat";

- "[i]gnoring warnings that the shooter intended to commit a mass shooting, including specific evidence that the shooter had petitioned to seal their criminal case records and sought the return of seized firearms"; and

- "[f]ailing to oversee or intervene in the Sheriff's Office's inaction despite credible evidence of escalating threats from the shooter." (ECF No. 29 at 47, 52–53.)

These allegations plainly aver that Government Defendants did too little—not too much. "But inaction is not redressable under § 1983." *Villanueva*, 463 F.Supp.3d at 1212 (citation omitted); *see also Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 919 n.7 (10th Cir. 2012) ("[I]naction by the state in the face of a known danger is not enough to invoke the protections of the Due Process Clause.") (internal quotation marks omitted).

And although Plaintiffs at times[6] try to recast these allegations of nonfeasance into allegations of malfeasance in their Response to the Motion—*e.g.*, by accusing

---

[6] The Court says "at times" because Plaintiffs mostly repeat the SAC's allegations that Government Defendants "failed to act" throughout their Response to the Motion. (*See generally* ECF No. 75.)

Government Defendants of "enact[ing] official policies of non-intervention" and "promis[ing] to withhold County funding and resources for any ERPO-related proceedings" (ECF No. 75 at 9, 10)—these allegations are more properly construed as failures to prevent the mass shooting from occurring, not creations or enhancements of that risk of harm in the first place.  See *Villanueva*, 463 F.Supp.3d at 1212 ("Defendants' decision to let plaintiff walk through the perimeter—even after seeing him—is better characterized as a failure to prevent plaintiff from entering the operational perimeter.  In other words, allowing plaintiff into the perimeter is inaction, not affirmative action."); *see also Cohen as next friend of Cohen v. Cty. of Portland*, 110 F.4th 400, 405 (1st Cir. 2024) ("Ultimately, the estate's counterargument depends entirely on recast[ing] inactions and omissions.  We therefore affirm the district court's dismissal of the state-created danger claim against Gervais.") (citation and internal quotation marks omitted).

      Even more to the point, the Resolution and the Statement did not create "an immediate threat of harm, which by its nature has a limited range and duration."  *Ruiz*, 299 F.3d at 1183.  As mentioned, the BoCC issued the Resolution in March 2018 (ECF No. 29-3 at 4), and Elder issued the Statement at some point in 2020 (ECF No. 29-4 at 2).  Yet the private harm at issue here—*i.e.*, the mass shooting[7]—did not occur until much later, in November 2021.  Hence, the Resolution and the Statement cannot be said to have created an immediate threat of harm in the state-created danger context.[8]

---

[7] To the extent Plaintiffs say the state action here was Government Defendants' failure to prevent Aldrich from recovering his firearms after the kidnapping and menacing charges were dismissed, the Court is unpersuaded.  (ECF No. 75 at 12.)  As explained below, Government Defendants' alleged failure to keep Aldrich from procuring firearms does not in these circumstances constitute affirmative action.

[8] Although the Court does not separately analyze the six elements listed above, this conclusion demonstrates that Plaintiffs have not satisfied the third element regarding immediacy

11

Nor can it be said that any risk of harm was durationally limited.  Government Defendants' refusal to enforce the Red Flag Law indefinitely left their constituents vulnerable to a panoply of harms from the get-go.  *See Gray*, 672 F.3d at 925 (rejecting danger-creation claim based on policies and customs that "were 'long-standing' and had been in effect 'for years'") (citation omitted); *see also Castaldo v. Stone*, 192 F.Supp.2d 1124, 1157 (D. Colo. 2001) (concluding that plaintiffs in mass shooting case had not satisfied the immediacy requirement under the state created danger doctrine where "[t]hirteen months elapsed between the Browns' initial complaint and the Columbine attack").

On this last point, it bears emphasizing that the Resolution and the Statement allegedly left *all* of Government Defendants' constituents in harm's way.  Indeed, these policy pronouncements were not directed at any discrete plaintiff; rather, they were generally applicable to the public at large.[9]  *See Gray*, 672 F.3d at 925 ("[A] State's adoption of generally-applicable policies and customs does not foist upon anyone an 'immediate threat of harm' having 'a limited range and duration.'") (citation omitted); *see also id.* ("[B]ecause the act of establishing such policies and customs does not pose a direct threat to any one particular individual but affects a broader populace, we deem such act too remote to establish the necessary causal link between the danger to the

---

and proximity.

[9] To the extent Plaintiffs argue that the policies specifically put the LGBTQ+ community at risk, that still isn't enough.  S*ee Gray*, 672 F.3d at 925 ("To be sure, Defendants' policies and customs did not increase the danger to the public at large in any real sense, but rather to a defined group, namely, patients in the EMU. . . . But this does not undermine our analysis.  The restrictive six-factor test we apply to danger creation claims requires not only that plaintiff be a 'member of a limited and specifically definable group,' but also that defendant's conduct specifically 'put plaintiff at substantial risk of serious, immediate, and proximate harm.'") (citation omitted).

12

victim and the resulting harm."). In this way, too, the Resolution and the Statement do not meet the Tenth Circuit's standards for pleading affirmative state conduct. *Ruiz*, 299 F.3d at 1183.

In reaching this conclusion, the Court has considered, but is ultimately unconvinced by, *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), on which Plaintiffs principally rely. *Currier* involved a danger-creation claim that arose out of conduct by state social workers. *Id.* at 908. One social worker recommended to the juvenile court that it place two children in their father's custody, despite knowing (but not disclosing) that he had previously allowed the children to live in "alarming conditions," would "have a hard time taking care of the kids," and had "made only eight child-support payments in the preceding three years." *Id.* at 909. The juvenile court granted custody to the father based on the social worker's recommendation. *Id.* Soon thereafter, the social worker learned that the father and his girlfriend had possibly been physically abusing the children but nonetheless did not investigate these matters further. *Id.* Tragically, one of the children died a few months later after the father poured boiling water on them. *Id.* at 910. Based on the social worker's failure to investigate and her recommendation for the children to be placed in their father's custody, the Tenth Circuit ultimately discerned a viable state created danger claim. *Id.* at 919.

Plaintiffs argue that *Currier* demonstrates that "deliberate inaction," like that complained of here, can satisfy the affirmative action precondition of the state-created danger analysis. But Plaintiffs stretch *Currier* too far. That decision's analysis was premised on *both* the social worker's (1) failure to investigate credible information that the children were being abused at their father's home *and* (2) the affirmative

13

recommendation that the kids be placed in his custody.  By contrast, here, Plaintiffs do not have any affirmative state action to which they can tether their allegations of inaction.  Plaintiffs instead rely solely on alleged omissions or failures to act on the part of Government Defendants.

*Currier* itself confirmed that its holding was not as far-reaching as Plaintiffs would have it:

> It is true that the conduct Plaintiffs complain of is partially a failure by Doran to act on particular allegations of abuse. Doran's failure to investigate allegations of abuse while the children were in state legal custody should be distinguished, however, from a claim that the state failed to rescue the children once legal custody was given to Vargas.  *Doran's failure to investigate allegations of abuse should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father.*

242 F.3d at 920 n.7 (emphasis added).

Furthermore, the Tenth Circuit has since dispelled any confusion regarding the breadth of *Currier*.  See *Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1263 (10th Cir. 2002) ("We concluded [in *Currier*] that a defendant social worker *had acted affirmatively by recommending that a parent be given legal custody of a child* despite the defendant's knowledge of evidence and allegations that the parent had previously abused the child.") (emphasis added); see also *T.D.*, 868 F.3d at 1226 ("*Currier* supports that, *because Ms. Patton recommended T.D.'s placement with Mr. Duerson*, she engaged in affirmative pre-placement conduct.") (emphasis added).  Other district courts have recognized this as well.  See, e.g., *Taylor v. Kan. Dep't of Corr.*, 2017 WL 1479375, at * 7 (D. Kan. Apr. 25, 2017) ("[P]laintiff contends that the Tenth Circuit, in [*Currier*], recognized that a state actor's failure-to-investigate can be considered an 'affirmative'

14

act for purposes of the danger-creation theory. Plaintiff misconstrues the *Currier* decision.").

Nor is this case akin to *Dwares v. City of New York*, 985 F.2d 84 (2nd Cir. 1993), as Plaintiffs posit. That court perceived a viable danger-creation claim where law enforcement had allegedly "conspired with the 'skinheads'" and "assur[ed] the 'skinheads' that unless they got totally out of control they would not be impeded or arrested." *Id.* at 99. Here, however, Government Defendants did not allegedly "conspire" with Aldrich or personally "assure" them that they essentially had a green light to commit the mass shooting. On the contrary, Government Defendants issued generally applicable policy statements proclaiming that they would not enforce Red Flag Laws across a broad range of circumstances, and as to any member of the public within their jurisdiction. No doubt, this was not "a prearranged official sanction of privately inflicted injury" like that in *Dwares*. *Id.*

The foregoing analysis illustrates why the Resolution and the Statement do not constitute affirmative conduct. That same analysis applies with equal force to Plaintiffs' remaining allegations of affirmative action as well. As mentioned, Plaintiffs aver that Government Defendants expended "minimal investigation" efforts and "actively enable[d] the shooter to reacquire weapons in the months leading up to the tragedy." (ECF No. 75 at 7.)

But allegations that Government Defendants conducted "minimal investigation" is, on its face, criticism that they *did not do enough* to prevent the private harm that befell Plaintiffs. *Villanueva*, 463 F.Supp.3d at 1212. It is not an allegation, for example, that Government Defendants' investigations somehow created or increased the risk of a

15

danger that did not already threaten Plaintiffs (and the general public).

Plaintiffs' allegation that Government Defendants acted affirmatively by enabling Aldrich to procure firearms before the mass shooting does not pass muster either.[10] The Court understands Plaintiffs' argument to go like this: Because Government Defendants failed to object to the state court sealing their criminal records, other eligible petitioners under the Red Flag Law were precluded from "access[ing] the information in the court record to assess Aldrich's threat to the community and initiate a petition for an ERPO."  (ECF No. 75 at 14.)  Plaintiffs continue: "In effect, through their affirmative acts, [Government Defendants] created a closed circuit of inaction—refusing to act themselves while simultaneously ensuring that others lacked the information necessary to do so—functionally insulating Aldrich from the very protective mechanisms the State had enacted to prevent precisely this kind of tragedy."  (*Id.*)

This particular theory of state action fails on multiple levels.  First, it starts with the false premise that Government Defendants failed to object to the state court sealing the court records.  But by the Court's reading of the SAC, Plaintiffs do not allege that this was Government Defendants' failure—instead, it was the *district attorney's* alleged failure.  (ECF No. 29 ¶ 121.)  Second, even assuming the SAC clearly alleges that Government Defendants failed to object, that allegation is self-defeating.  Again,

---

[10] To the extent Plaintiffs assert that Government Defendants "affirmatively facilitated [Aldrich's] path toward rearmament and, ultimately, to the Club Q shooting," the Court does not understand how this can be the case.  (ECF No. 75 at 17–18.)  For the reasons explained in the body of this analysis, Government Defendants' alleged failure to oppose the sealing of court records did not "affirmatively facilitate" Aldrich's rearmament.  Same with Government Defendants' alleged refusal to return Aldrich's firearms to them after the kidnapping and menacing charges were dismissed.  That refusal can only be construed as *inhibiting* Aldrich from committing the mass shooting.  (*See* ECF No. 29 ¶ 122 (alleging that "[l]aw enforcement officials" denied Aldrich's request to return their "seized firearms").)

inaction cannot constitute affirmative conduct. Third and finally, Government Defendants point out that state law *requires* that a defendant's criminal justice record be sealed after their case is completely dismissed. *See* § 24-72-705(1)(a)(I), C.R.S. (2025) ("On its own motion, the court *shall* order the defendant's criminal justice records sealed when [a] case against the defendant is completely dismissed[.]") (emphasis added). Thus, it is legally immaterial that Government Defendants (or the district attorney, for that matter) did not object to the sealing of Aldrich's records. The state court was mandated by statute to do that anyway.

All this being said, Plaintiffs' allegations in their SAC are profoundly and deeply troubling. As alleged, Government Defendants knew in no-uncertain-terms that Aldrich had proclaimed that "they planned to be the next mass killer and had been stockpiling ammunition, firearms, and bullet-proof body armor." (ECF No. 29 ¶ 98.) Yet Government Defendants defiantly did nothing, contemptuously ignoring the will of the people, and refused to avail themselves of the critical tool the legislature had just equipped them with—*the* tool that might have prevented the monstrous and bloody act which cost the lives of and seriously wounded so many innocent Coloradans—to take Aldrich's firearms from them. To be sure, these allegations amount to much more than mere negligence—they represent a conscious and intentional disregard of a known and unjustifiable risk, something which in the Court's view amounts to an abdication of local officials' moral responsibility to protect the public.

Plaintiffs can take some slim solace in the fact that, while the individual county commissioners and Sheriff Elder are via this Order escaping legal liability for their inaction and omissions, their collective role in refusing to at least *try* to thwart what most

17

likely was a horrific but preventable tragedy should weigh heavily on their individual consciences, and most certainly will not be forgotten by the people of Colorado.

Nevertheless, the allegations are still premised only on inaction. And unfortunately for Plaintiffs, inaction cannot constitute a legal violation of Plaintiffs' substantive due process rights under *DeShaney* and its progeny.

For all these reasons, the Court has no choice but to dismiss the state-created danger claims.[11]

### IV.   CONCLUSION

For the foregoing reasons, the Motion is GRANTED. (ECF Nos. 32, 57)

Dated this 7th day of July, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge

---

[11] Because the Court discerns no affirmative state action, it need not address the aforementioned elements of a state-created danger claim, nor Government Defendants' governmental immunity defenses.